**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| STRATOPATENT LLC,<br><br>Plaintiff,<br><br>v.<br><br>URBAN OUTFITTERS, INC.,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 2:26-cv-1020<br><br>JURY TRIAL DEMANDED |

## PLAINTIFF'S ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Stratopatent LLC ("Plaintiff" or "Stratopatent") files this Original Complaint in the Eastern District of Texas (the "District") against Defendant Urban Outfitters, Inc. ("Urban Outfitters" or "Defendant") for infringement of Plaintiff's patents U.S. Patent No. 11,087,392 (the "'392 patent"), U.S. Patent No. 11,348,166 (the "'166 patent"), U.S. Patent No. 10,902,510 (the "'510 patent"), and U.S. Patent No. 12,033,208 (the "'208 patent") (collectively referred to as the "Asserted Patents").

## THE PARTIES

1. Plaintiff Stratopatent LLC is a Texas limited liability company with its principal place of business located at 5900 Balcones Drive, Suite 100, Austin, TX 78731.

2. On information and belief, Defendant Urban Outfitters, Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business located at 5000 South Broad Street, Philadelphia, Pennsylvania 19112. Defendant Urban Outfitters, Inc. is registered to do business in Texas and may be served via its registered agents,

for example, Corporation Service Company D/B/A+ at 211 E. 7th Street Suite 620, Austin, TX 78701.

3. On information and belief, Urban Outfitters' subsidiaries, agents, and alter egos include URBN SR LLC ("Nuuly") and URBN US Retail LLC, each a limited liability company organized under the laws of the Commonwealth of Pennsylvania, with a principal place of business at 5000 South Broad Street, Philadelphia, Pennsylvania 19112. *Franchise Tax Account Status for URBN SR LLC*, TEXAS COMPTROLLER, https://comptroller.texas.gov/taxes/franchise/account-status/search/32071861770 (last visited Oct. 23, 2026); *Franchise Tax Account Status for URBN US RETAIL LLC*, TEXAS COMPTROLLER, https://comptroller.texas.gov/taxes/franchise/account-status/search/12326866667 (last visited Oct. 23, 2026). On information and belief, each of URBN SR LLC and URBN US RETAIL LLC is a wholly-owned subsidiary of Defendant Urban Outfitters, Inc., shares its principal place of business with Urban Outfitters, and each of Urban Outfitters, URBN SR LLC, and URBN US RETAIL LLC shares each officer listed in the respective entity's Texas Public Information Report for Year 2026, including Secretary, Azeez Hayne; Chief Operating Officer, Francis ("Frank") J. Conforti; and Chief Financial Officer, Melanie Marein-Efron. *See Form 10-K Report for Urban Outfitters, Inc.,* URBAN OUTFITTERS, INC., available at https://www.sec.gov/Archives/edgar/data/912615/000119312526137916/urbn-20260131.htm (for the fiscal year ended Jan. 31, 2026) (last visited Oct. 26, 2026) [hereinafter "2026 Annual Report"] at 36, 41; *2026 Annual Report, Ex. 21.1, Subsidiaries of Urban Outfitters, Inc., a Pennsylvania corporation,* URBAN OUTFITTERS, INC., https://www.sec.gov/Archives/edgar/data/912615/000119312526137916/urbn-ex21_1.htm (last visited Oct. 26, 2026) [hereinafter "2026 Annual Report, Ex. 21.1" or "Ex. 21.1"]; *Franchise Tax Account Status for URBN SR LLC*, TEXAS COMPTROLLER,

https://comptroller.texas.gov/taxes/franchise/account-status/search/32071861770 (last visited Oct. 23, 2026); *Franchise Tax Account Status for URBAN OUTFITTERS, INC.*, TEXAS COMPTROLLER, https://comptroller.texas.gov/taxes/franchise/account-status/search/12320033322 (last visited Oct. 23, 2026); *Franchise Tax Account Status for URBN US RETAIL LLC*, TEXAS COMPTROLLER, https://comptroller.texas.gov/taxes/franchise/account-status/search/12326866667 (last visited Oct. 23, 2026).

4. Urban Outfitters states, "[w]e operate under three reportable segments – Retail, Subscription and Wholesale" and "[o]ur Subscription segment includes the Nuuly brand, which offers customers a more sustainable way to explore fashion primarily through a monthly women's apparel subscription rental service." 2026 Annual Report at 1. Urban Outfitters owns URBN SR LLC and operates the Nuuly Platform and Service within Urban Outfitters' Subscription segment, which was "formerly known as the Nuuly segment." *See* 2026 Annual Report at 36, 41, Ex. 21.1; *Form 10-K Report for Urban Outfitters, Inc.,* URBAN OUTFITTERS, INC., available at https://www.sec.gov/Archives/edgar/data/912615/000095017025048506/urbn-20250131.htm (for the fiscal year ended Jan. 31, 2025) (last visited Oct. 26, 2026) [hereinafter "2025 Annual Report"] at 1 (stating "[o]ur Subscription segment, formerly known as the Nuuly segment, includes the Nuuly brand").

5. Urban Outfitters states that its "Retail segment includes [its] store and digital channels and primarily includes [its] Anthropologie, Free People, FP Movement, and Urban Outfitters brands." *See* 2026 Annual Report at 1. "In addition to retail stores, [Urban Outfitters] offers [its] products and services directly to [its] customers through [its] websites, mobile applications, social media and third-party digital platforms and customer contact centers." *See id.* On information and belief, Urban Outfitters' digital commerce operations (including across its

Urban Outfitters, Free People, FP Movement, and Anthropologie brands) are operated through a common e-commerce platform (the "URBN E-Commerce Platform and Service") built on IBM's Sterling Order Management System operating on Google Cloud's AlloyDB for PostgreSQL, which serves as "the nerve center of its global ecommerce operations, orchestrating everything from order capture and real-time inventory tracking to fulfillment optimization and post-purchase logistics." *See Urban Outfitters achieves major cost savings by moving Sterling OMS to AlloyDB for PostgreSQL*, GOOGLE CLOUD, https://cloud.google.com/blog/products/databases/urban-outfitters-moves-sterling-oms-to-alloydb-for-postgresql (May 20, 2026) (accessed Sep. 29, 2026) ("Urban Outfitters, Inc. (URBN) relies on IBM Sterling Order Management System (Sterling OMS) as the nerve center of its global ecommerce operations, orchestrating everything from order capture and real-time inventory tracking to fulfillment optimization and post-purchase logistics."). Under the Nuuly brand, Urban Outfitters offers a platform and associated services (the "Nuuly Platform and Service") that provide goods and services including a monthly women's apparel subscription rental service through which, for a monthly fee, subscribers rent product via a custom-built digital platform, wear the product, and swap into new product the following month, with the option to purchase rental product. *See How Nuuly Works*, NUULY, https://www.nuuly.com/rent/how-it-works (last visited Sep. 29, 2026). The Nuuly Platform and Service is operated on a cloud-based architecture leveraging Google Kubernetes Engine and Confluent Cloud. *See Nuuly Completes Flawless Launch of its New Clothing Rental Subscription Service with Confluent Cloud*, CONFLUENT, https://www.confluent.io/customers/nuuly/ (accessed Sep. 29, 2026). The URBN E-Commerce Platform and Service, the Nuuly Platform and Service, and related services (e.g., inventory maintenance and tracking, curating, shipping, cleaning, repair,

subscription clothing rental services, and/or sales), user-facing applications, websites, and mobile applications, are referred to collectively herein as the "Accused Instrumentalities."

6. On information and belief, Defendant, along with its subsidiaries, agents, alter egos, divisions, and related entities, is engaged in making, using, selling, offering for sale, and/or importing its products and services, including the Accused Instrumentalities, within the United States, the State of Texas, and the Eastern District of Texas.

7. On information and belief, Defendant Urban Outfitters, Inc. maintains a regular and established physical place of business in this District, including at least through its Urban Outfitters retail store located at 2601 Preston Road, Space 1239, Frisco, Texas 75034, in Collin County, within the Eastern District of Texas, as well as other Urban Outfitters, Anthropologie, Free People, and/or FP Movement retail stores operated in this District. Through these physical retail locations and its digital channels, Defendant conducts continuous and systematic business in this District. County property records indicate that these physical locations include at least the following locations in Collin County, Texas.

| Owner Name | Owner ID | Situs Address | Legal Description | Appraised |
|---|---|---|---|---|
| URBN US RETAIL LLC | 1230753 | 7205 BISHOP RD 000E5, PLANO TX 75024 | BPP AT 7205 BISHOP RD | $322,487 |
| URBN US RETAIL LLC | 1230753 | 902 WATTERS CREEK BLVD, ALLEN TX 75013 | BPP AT 902 WATTERS CREEK BLVD | $311,286 |
| URBN US RETAIL LLC | 1230753 | 7400 WINDROSE AVE 0B100, PLANO TX 75024 | BPP AT 7400 WINDROSE AVE | $181,945 |
| URBN US RETAIL LLC | 1230753 | 2601 PRESTON RD 01069, FRISCO TX 75034 | BPP AT STONEBRIAR MALL | $824,395 |

8. Defendant utilizes these local retail locations, its personnel, and its digital channels to market, sell, offer for sale, fulfill, and support its products and services, including the Accused Instrumentalities, to customers in Texas, this District, and across the United States.

## JURISDICTION AND VENUE

9. This action arises under the patent laws of the United States, namely Title 35 of the United States Code, including 35 U.S.C. §§ 271, 281, and 284–285.

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

11. Defendant is subject to this Court's specific and general personal jurisdiction pursuant to due process and/or the Texas Long Arm Statute, due at least to Defendant's substantial business in the State of Texas and this District, including: (A) at least part of its infringing activities alleged herein which purposefully avail Defendant of the privilege of conducting those activities in this State and this District and, thus, submit Defendant to the jurisdiction of this Court; and (B) regularly doing or soliciting business, engaging in other persistent conduct targeting residents of Texas and this District, and/or deriving substantial revenue from infringing goods and services imported into, offered for sale, sold, and/or used in Texas and this District. Specifically, Defendant, alone and in concert with its subsidiaries, agents, affiliates, and alter egos, markets, sells, offers for sale, uses, and/or provides the Accused Instrumentalities in connection with customers and users within this District and the State of Texas, including through its retail stores and digital channels.

12. This Court has personal jurisdiction over Defendant, directly and/or through the activities of its alter egos, intermediaries, agents, related entities, subsidiaries, affiliates, vendors, suppliers, partners, subscribers, customers, end users, and/or consumers, including through the activities of its wholly-owned subsidiaries, agents, and alter egos URBN SR LLC and URBN US RETAIL LLC. Through its own conduct and its direction and control of these entities, Defendant has committed acts of direct and/or indirect patent infringement within Texas and elsewhere within the United States giving rise to this action and/or has established minimum contacts with Texas

such that personal jurisdiction over Defendant would not offend traditional notions of fair play and substantial justice.

13. On information and belief, Defendant Urban Outfitters, Inc. maintains a regular and established physical place of business in this District, including at least through its Urban Outfitters retail store located at 2601 Preston Road, Space 1239, Frisco, Texas 75034, in Collin County, within the Eastern District of Texas, as well as other Urban Outfitters, Anthropologie, Free People, and/or FP Movement retail stores operated in this District.

14. On information and belief, Defendant regularly conducts business in this District through its Urban Outfitters, Anthropologie, Free People, and/or FP Movement retail stores and its integrated omni-channel of websites and mobile applications, through which it markets, offers for sale, sells, and provides its products and services, including by operating the URBN E-Commerce Platform and Service and the Nuuly Platform and Service (including through its wholly-owned subsidiaries, agents, and/or alter egos URBN SR LLC and URBN US RETAIL LLC), for the benefit of customers located in this District and the State of Texas.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1400(b). Defendant has committed acts of patent infringement in this District, and Defendant resides in and/or has a regular and established physical place of business in this District. Specifically, Defendant operates retail stores in the Eastern District of Texas, including at least its Urban Outfitters retail store located in Frisco, Texas, in Collin County, within this District.

16. Accordingly, Defendant has significant ties to, and presence in, the State of Texas and the Eastern District of Texas, making venue in this Judicial District both proper and convenient for this action.

**THE ASSERTED PATENTS AND ACCUSED TECHNOLOGY**

17. Stratopatent is the owner of all right, title, and interest in and to the Asserted Patents, with the full right to exclude others and to enforce, sue, and recover damages for past, present, and future infringements.

18. On information and belief, a significant portion of the operating revenue of Defendant is derived from the design, development, marketing, distribution, use, operation, sale, and provision of the Accused Instrumentalities and associated retail and subscription products and services, including the URBN E-Commerce Platform and Service and the Nuuly Platform and Service, which are marketed, offered, sold, provided, and used in the United States and this District.

19. On information and belief, Defendant designs, develops, tests, uses, markets, offers, sells, distributes, operates, and/or provides the Accused Instrumentalities, which are provided to and used by at least employees, suppliers, businesses, brands, and customers in the United States and this District. The Accused Instrumentalities are computer-implemented platforms that dynamically manage data associated with electronic transactions of items, including wearable items such as garments, across Defendant's retail and subscription clothing businesses.

20. Urban Outfitters' Nuuly Platform is a subscription-based clothing-rental service through which consumers rent apparel (including designer and branded apparel) online. It operates on a cloud-based architecture, leveraging Google Kubernetes Engine and Confluent Cloud to run event-driven applications, and serves "as the central nervous system" of Nuuly operations, "spanning everything" from its "customer-facing applications" to its "distribution center operations."

> "We truly think of Confluent Cloud and Kafka as the central nervous system of our business, spanning everything from the customer-facing applications to distribution center operations from a technology perspective."
>
> Chirag Dadia
> Director of Engineering, Nuuly

To support this new business model, Nuuly needed an entirely new IT infrastructure. The legacy IT systems in place at Urban Outfitters were designed and built for traditional retail sales and delivery. These existing systems could not handle the significantly more complex logistics that are required to handle tracking garments throughout multiple rental, return and cleaning cycles on top of tracking user interaction data to improve the customer experience. "We quickly came to a realization our new business model was very different from a typical e-commerce model and that we would need a real-time event driven architecture to support it," says Chirag Dadia, Director of Engineering at Nuuly. The challenge of building such an architecture from the ground up was compounded by time pressures imposed by the industry. Not only did Nuuly want to beat potential competitors to market, but if the development team missed the target launch deadline, the fashions the company had planned to offer in summer would no longer be appropriate for the fall season.

A team of engineers and developers at Nuuly designed, built and deployed a real-time event streaming architecture based on Confluent Cloud and Apache Kafka on schedule in just six months. This architecture serves as the IT foundation for all of the company's operations. "In January we had an empty plot of land, and in July we launched with not only a new distribution center, but with fully operational production event-driven applications," says Dadia. "We truly think of Confluent Cloud and Kafka as the central nervous system of our business, spanning everything from the customer-facing applications to distribution center operations from a technology perspective. We've trusted our entire business on Confluent expertise in ensuring that our Kafka cluster is going to keep running smoothly and operating as it is supposed to."

Part of that experience led the team to use a number of Google Cloud Platform services, including Google Cloud Storage, BigQuery, and Google Kubernetes Engine (GKE). Because the team needed the order of events to be preserved, they opted for Kafka. From there, they quickly chose to use Confluent Cloud rather than manage their own Kafka cluster on-prem or in the cloud. "We're a big fan of managed services. That's behind our decision to work with Google Cloud, and a big reason why Confluent Cloud became an obvious choice for us," says Dadia. "We also needed to get up and running as fast as possible, so we needed something that could be provisioned quickly, almost instantaneously. That's another reason we chose Confluent Cloud.

*See Nuuly Completes Flawless Launch of its New Clothing Rental Subscription Service with Confluent Cloud*, CONFLUENT, https://www.confluent.io/customers/nuuly/ (accessed Sep. 29, 2026).

21. Urban Outfitters' Nuuly Platform and Service is marketed, offered, sold, distributed, provided and/or used across the United States, including directly within this District, thereby directly and/or indirectly violating Stratopatent's patent rights.

22. Additionally, Urban Outfitters designs, develops, tests, uses, markets, offers, sells, distributes, operates, and/or provides an e-commerce platform spanning its Urban Outfitters, Free People, FP Movement, and Anthropologie brands. The URBN E-Commerce Platform and Service operates on a cloud-based architecture that leverages IBM's Sterling Order Management System running on Google Cloud's AlloyDB for PostgreSQL, which serves as "the nerve center of its global ecommerce operations, orchestrating everything from order capture and real-time inventory tracking to fulfillment optimization and post-purchase logistics."

> ***Editor's note:*** *Urban Outfitters, Inc. (URBN) recently completed a major infrastructure upgrade, migrating its IBM Sterling Order Management System (Sterling OMS) from an Oracle database to Google Cloud's AlloyDB for PostgreSQL. This strategic move, a testament to the growing partnership between Google Cloud and IBM, delivers significant benefits for URBN, paving the way for increased efficiency, reduced costs, and a future-proofed technology landscape. This success story showcases how businesses can leverage AlloyDB for PostgreSQL to modernize their databases and unlock new levels of performance and scalability.*
>
> In the fast-paced world of retail, order management is the backbone of a seamless customer experience. Urban Outfitters, Inc. (URBN) relies on IBM Sterling Order Management System (Sterling OMS) as the nerve center of its global ecommerce operations, orchestrating everything from order capture and real-time inventory tracking to fulfillment optimization and post-purchase logistics. This system helps ensure that URBN can efficiently process millions of transactions across its global network of stores, warehouses, and digital channels, delivering on customer expectations for fast, accurate, and flexible order fulfillment.

*Urban Outfitters achieves major cost savings by moving Sterling OMS to AlloyDB for PostgreSQL*, GOOGLE CLOUD, https://cloud.google.com/blog/products/databases/urban-outfitters-moves-sterling-oms-to-alloydb-for-postgresql (accessed Sep. 29, 2026).

23. Through the URBN E-Commerce Platform and Service, Urban Outfitters handles the front- and back-end operations that allow consumers to shop for items, create user accounts,

place orders, have items shipped and tracked, and process returns, together with internal-facing services such as data analytics and inventory and warehouse management. As set forth below, the infringement theories for the ’166 patent and ’208 patent are not limited to the Nuuly Platform and Service but also extend to the URBN E-Commerce Platform and Service.

24. Urban Outfitters’ Nuuly Platform and Service operates in a manner that infringes the ’392 patent,’166 patent, ’208 patent, and ’510 patent by implementing each step of the claimed methods and systems. For example, the Nuuly Platform and Service is a computer-implemented platform that dynamically manages data associated with electronic transactions of items, including wearable items.







*How It Works*, Nuuly, https://www.nuuly.com/rent/how-it-works (accessed Sep. 29, 2026).

25. Urban Outfitters' Nuuly Platform and Service receives item data describing one or more items (e.g., wearable items such as garments) made available for physical shipment to users via electronic transactions and/or electronic transaction application programming interfaces (APIs). The item data is received via one or more processors and includes, for example, catalog data and item attributes describing wearable items. The Nuuly Platform and Service uses the item data to make items available for online rental and delivery via electronic transactions.




*Fall Colors*, NUULY, https://www.nuuly.com/rent/the-edit (accessed Sep. 29, 2026).

26. Additionally, the Nuuly Platform and Service provides functionality for receiving item data from an electronic tenant interface including a user interface that is accessible from a tenant device over a network. In Urban Outfitters' cloud architecture, examples of "tenants" include entities that allocate and/or supply apparel, for example, external brands, in-house brands, vendors, and/or suppliers. Nuuly explicitly provides user interfaces for tenants such as "business partners on the brand side."

> The biggest competitive advantage we get using Google Cloud is the managed services. There are so many capabilities built in to Google Cloud, so it's easy for us to adopt new features as quickly as possible to stay competitive. For example, we can capture all events streaming into BigQuery, then add a reporting dashboard easily for our business partners on the brand side. They can then make informed decisions on what to buy based on updated user information. Using Google Cloud's many features also means we can offer our customers more cool features so they can try new styles and new ways of expressing themselves. We can offer different channels to different customers based on age group, for example, to recommend new styles to try without having to buy them.

*Trying cloud on for size: URBN's Nuuly builds from scratch with Google Cloud,* GOOGLE CLOUD https://cloud.google.com/blog/topics/customers/cloud-for-retail-helps-urbn-nuuly-subscription-service-launch (Jan. 9, 2020) (accessed Sep. 29, 2026).

27. Further, Urban Outfitters' back-end systems manage all aspects of inventory and item control, including item attributes, making the wearable items available for online rental. In addition to Urban Outfitters' provision of user interfaces for consumers and brand partners, on information and belief, Urban Outfitters provides user interfaces utilized by electronic tenants, including vendors, suppliers, external brand managers, and/or in-house brand managers, who use their own terminals (for example, via "tenant devices" or "employee devices") over the network to upload apparel catalog data, sizes, and configurations, making these wearable items available for physical shipment.



> A team of engineers and developers at Nuuly designed, built and deployed a real-time event streaming architecture based on Confluent Cloud and Apache Kafka on schedule in just six months. This architecture serves as the IT foundation for all of the company's operations. "In January we had an empty plot of land, and in July we launched with not only a new distribution center, but with fully operational production event-driven applications," says Dadia. "We truly think of Confluent Cloud and Kafka as the central nervous system of our business, spanning everything from the customer-facing applications to distribution center operations from a technology perspective. We've trusted our entire business on Confluent expertise in ensuring that our Kafka cluster is going to keep running smoothly and operating as it is supposed to."

> Part of that experience led the team to use a number of Google Cloud Platform services, including Google Cloud Storage, BiqQuery, and Google Kubernetes Engine (GKE). Because the team needed the order of events to be preserved, they opted for Kafka. From there, they quickly chose to use Confluent Cloud rather than manage their own Kafka cluster on-prem or in the cloud. "We're a big fan of managed services. That's behind our decision to work with Google Cloud, and a big reason why Confluent Cloud became an obvious choice for us," says Dadia. "We also needed to get up and running as fast as possible, so we needed something that could be provisioned quickly, almost instantaneously. That's another reason we chose Confluent Cloud.

*See Nuuly Completes Flawless Launch of its New Clothing Rental Subscription Service with Confluent Cloud*, CONFLUENT, https://www.confluent.io/customers/nuuly/ (accessed Sep. 29, 2026).

28. Various types of data about items are received and processed by the Nuuly Platform and Service, which operates on a cloud-based architecture to manage its distribution center operations, including physical inventory management and order processing.




*Fall Colors*, NUULY, https://www.nuuly.com/rent/the-edit (accessed Sep. 29, 2026).

**How and where do you ship items?**

Once your order is placed, you can expect up to 5 business days for delivery. Orders are shipped, except for certain oversized items, in a reusable Nuuly bag. We are not currently able to ship outside of the United States or to PO Boxes or APO/FPO addresses.

*Shipping*, NUULY, https://www.nuuly.com/rent/help/shipping (accessed Sep. 29, 2026).

29. Urban Outfitters' Nuuly Platform and Service hosts at least one electronic warehouse operations portal and/or administrative portal that includes user interfaces accessible from at least one device (e.g. desktops, laptops and/or mobile devices of system administrators, logistics personnel, suppliers, in-house brand managers, external brand partners, and/or consumers) over at least one network (e.g., the Internet). Nuuly's portals and user interfaces are used to manage inventory, sales, fulfillment and distribution center operations. For example, warehouse, store, and/or logistics staff utilize these web-enabled user interfaces to manage company operations (e.g., inventory, cataloguing, online storefront, subscription management, rental management, routing, order fulfillment, and return processing), enabling associates to perform operational tasks, track orders and returns, and record data related to items (e.g., wearable items).

30. The warehouse operations portal and/or administrative portal is configured to communicate with the Nuuly Platform and Service and/or otherwise enable at least one microservice (e.g., order processing, inventory allocation, garment allocation, fulfillment, and/or return processing) to be initiated. As an example, the warehouse operations portal may be external to one or more data warehouse systems (for example, data warehouse systems of business partners).

> The biggest competitive advantage we get using Google Cloud is the managed services. There are so many capabilities built in to Google Cloud, so it's easy for us to adopt new features as quickly as possible to stay competitive. For example, we can capture all events streaming into BigQuery, then add a reporting dashboard easily for our business partners on the brand side. They can then make informed decisions on what to buy based on updated user information. Using Google Cloud's many features also means we can offer our customers more cool features so they can try new styles and new ways of expressing themselves. We can offer different channels to different customers based on age group, for example, to recommend new styles to try without having to buy them.

*Trying cloud on for size: URBN's Nuuly builds from scratch with Google Cloud*, GOOGLE CLOUD BLOG, https://cloud.google.com/blog/topics/customers/cloud-for-retail-helps-urbn-nuuly-subscription-service-launch (Jan. 9, 2020) (accessed Sep. 29, 2026).

31. Urban Outfitters' Nuuly Platform and Service receives, by the one or more processors, at least one electronic user transaction initiated at a user platform with at least one user interface accessible by a user device over a network (e.g., via the Internet). For example, consumers subscribing to the Nuuly service may rent any six apparel items on a monthly basis and may also choose to keep and purchase any of those items. Each electronic user transaction is associated with at least one unique user identifier and at least one unique item identifier identifying an item (e.g., wearable item) described in the received item data (e.g., the wearable item data) to be placed in a virtual closet and rented or purchased according to a subscription, purchase, or rental service, which, for the Nuuly Platform and Service, includes a subscription plan that provides for the purchase of rented products.






*How It Works*, NUULY, https://www.nuuly.com/rent/how-it-works (accessed Sep. 29, 2026).

32. Urban Outfitters' Nuuly Platform and Service receives at least one request from the warehouse operations portal, the electronic administrative portal, and/or the electronic tenant interface to initiate order processing of an item (e.g., wearable item) associated with a unique user identifier and a unique item identifier. For example, the Nuuly Platform and Service provides an IT framework that brings together all of the individual components required to enable the processing and fulfillment of subscription, rental and/or purchase orders for unique customers with unique items.

33. In response to receiving the at least one request, Urban Outfitters' Nuuly Platform and Service initiates at least one microservice (e.g., an API implemented as a microservice hosted via a virtual private cloud) to fulfill the at least one request (e.g., wearable item operations requests) to initiate shipping of the item to the user at a physical address according to the subscription. Examples of these microservices include order processing, garment allocation, fulfillment, and return processing. For example, the Nuuly Platform and Service employs Google Kubernetes Engine and Confluent Cloud, to ingest and synchronize product orders and inventories over secure networks and to connect its customer-facing applications with its distribution center operations.

> "We truly think of Confluent Cloud and Kafka as the central nervous system of our business, spanning everything from the customer-facing applications to distribution center operations from a technology perspective."
>
> Chirag Dadia
> Director of Engineering, Nuuly

*See Nuuly Completes Flawless Launch of its New Clothing Rental Subscription Service with Confluent Cloud*, CONFLUENT, https://www.confluent.io/customers/nuuly/ (accessed Sep. 29, 2026).

> As the engineering lead, I did a lot of up-front analysis to figure out which would be the best cloud partner for us. Google checked off a lot of boxes, and we knew the data management platform would support our needs, so we chose Google Cloud. Our 15-person team was able to build the entire new platform in the 10-month timeframe because we chose Google—we didn't have to hire an operations team to solve the problem. Using Google Cloud services let us bootstrap quickly and build our business on top of that. That platform includes an entire warehouse management system, and the software powering the brand-new distribution center.
>
> ## Powering our subscribers with data
>
> With Google Cloud, we've built a data backbone that lets us integrate data from different sources, messaging, stream processing and ETL jobs. We chose Google Kubernetes Engine (GKE) and multiple Google Cloud managed data offerings, including BigQuery, Data Studio, Cloud Storage, TensorFlow, and more. We use an event-driven architecture with Kafka as the main event manager. We run a Confluent cluster on Google Cloud, which helps us meet our strict event data ordering requirement.

*Trying cloud on for size: URBN's Nuuly builds from scratch with Google Cloud*, GOOGLE CLOUD BLOG, https://cloud.google.com/blog/topics/customers/cloud-for-retail-helps-urbn-nuuly-subscription-service-launch (Jan. 9, 2020) (accessed Sep. 29, 2026).

34. The Nuuly Platform and Service provides functionality to update a transaction database and an analytics database based on either completion of an item operations request or based on an electronic user transaction. For example, in response to receiving an electronic user transaction and an item operations request, the Nuuly Platform and Service updates databases and

initiates shipping of a wearable item to the user at a physical address. This functionality is enabled by the IT infrastructure Urban Outfitters has developed.

> To support this new business model, Nuuly needed an entirely new IT infrastructure. The legacy IT systems in place at Urban Outfitters were designed and built for traditional retail sales and delivery. These existing systems could not handle the significantly more complex logistics that are required to handle tracking garments throughout multiple rental, return and cleaning cycles on top of tracking user interaction data to improve the customer experience. "We quickly came to a realization our new business model was very different from a typical e-commerce model and that we would need a real-time event driven architecture to support it," says Chirag Dadia, Director of Engineering at Nuuly. The challenge of building such an architecture from the ground up was compounded by time pressures imposed by the industry. Not only did Nuuly want to beat potential competitors to market, but if the development team missed the target launch deadline, the fashions the company had planned to offer in summer would no longer be appropriate for the fall season.
>
> A team of engineers and developers at Nuuly designed, built and deployed a real-time event streaming architecture based on Confluent Cloud and Apache Kafka on schedule in just six months. This architecture serves as the IT foundation for all of the company's operations. "In January we had an empty plot of land, and in July we launched with not only a new distribution center, but with fully operational production event-driven applications," says Dadia. "We truly think of Confluent Cloud and Kafka as the central nervous system of our business, spanning everything from the customer-facing applications to distribution center operations from a technology perspective. We've trusted our entire business on Confluent expertise in ensuring that our Kafka cluster is going to keep running smoothly and operating as it is supposed to."

*Nuuly Completes Flawless Launch of its New Clothing Rental Subscription Service with Confluent Cloud*, CONFLUENT, https://www.confluent.io/customers/nuuly/ (accessed Sep. 29, 2026) (emphasis added).

35. Moreover, Urban Outfitters' infringement of the '166 patent and the '208 patent is not limited to the Nuuly Platform and Service. The URBN E-Commerce Platform and Service (including the e-commerce operations infrastructure across the Urban Outfitters, Free People, FP Movement, and Anthropologie brands) also practices each step of at least claim 1 of the '166 patent and claim 1 of the '208 patent. The URBN E-Commerce Platform and Service is a computer-implemented method for dynamically managing data associated with electronic transactions of items. It receives item data describing items made available for physical shipment to users via electronic transactions, for example, via electronic transaction APIs.




*Men's Clothing*, URBAN OUTFITTERS, https://www.urbanoutfitters.com/mens-clothing (accessed Sep. 29, 2026).



Free Shipping On Orders $60+ Details | Sign Up For SMS | Gift Cards | UO Rewards | Stores | Sign In / Sign Up

URBAN OUTFITTERS

What are you looking for?

New | Women's | Men's | Jeans | Shoes | Accessories | Home | Music | Beauty + Wellness | Gifts | Brands | Sale

Help
- Help
  - Account + Sign-in
  - Returns + Exchanges
  - Shipping
  - International Shipping
  - Orders + Payments
  - Cancellation Policy
  - Store Pickup
  - Collection Points
  - Frequently Asked Questions
  - Gift Cards
  - Size Charts
  - UO Rewards
  - UO MRKT
  - ME@UO
- Connect
  - Contact Us
  - Store Locations
  - UO Affiliates
- Your Privacy Rights

Shipping

| Method | Shipping Time | Cost |
|---|---|---|
| Standard | Arrives in 5-8 business days | Orders up to $59.99: $7.50<br>Orders $60 and over: FREE |
| Express | Arrives in 2-3 business days | $14.95 |
| Rush | Arrives in 1-2 business days | $24.95 |
| Truck | Arrives in 1-3 weeks once shipped | Cost may vary |

Standard shipping is free on US orders over $60. If you're ordering through the UO app, standard shipping is free on US orders over $50.

These shipping rates are not applicable for orders shipped outside of the US. Some oversized items may require an additional shipping charge. Free Shipping applies only to merchandise; taxes and Gift Cards do not count toward the Free Shipping total. Rush Shipping may not be available for all orders depending on fulfillment location.

Shipping outside of the US? Visit our International Shipping + Returns page.
For UO MRKT shipping information please visit our UO MRKT page.

Please note that all product-related issues, such as missing or damaged items/packages, must be reported within 30 days of the shipping date.

Our Shipping Process

We package and ship your order as soon as possible. We start working on your order immediately, so we are unable to make any changes or modifications to an order after it has been placed.

*Shipping,* URBAN OUTFITTERS, https://www.urbanoutfitters.com/help/shipping (accessed Sep. 29, 2026).

36. The URBN E-Commerce Platform and Service hosts an electronic warehouse operations portal and electronic administrative portal, for example, as implemented through IBM's Sterling Order Management System on Google Cloud's AlloyDB for PostgreSQL and comprising user interfaces accessible from one or more devices over one or more networks.

> ***Editor's note:*** *Urban Outfitters, Inc. (URBN) recently completed a major infrastructure upgrade, migrating its IBM Sterling Order Management System (Sterling OMS) from an Oracle database to Google Cloud's AlloyDB for PostgreSQL. This strategic move, a testament to the growing partnership between Google Cloud and IBM, delivers significant benefits for URBN, paving the way for increased efficiency, reduced costs, and a future-proofed technology landscape. This success story showcases how businesses can leverage AlloyDB for PostgreSQL to modernize their databases and unlock new levels of performance and scalability.*
>
> In the fast-paced world of retail, order management is the backbone of a seamless customer experience. Urban Outfitters, Inc. (URBN) relies on IBM Sterling Order Management System (Sterling OMS) as the nerve center of its global ecommerce operations, orchestrating everything from order capture and real-time inventory tracking to fulfillment optimization and post-purchase logistics. This system helps ensure that URBN can efficiently process millions of transactions across its global network of stores, warehouses, and digital channels, delivering on customer expectations for fast, accurate, and flexible order fulfillment.

*Urban Outfitters achieves major cost savings by moving Sterling OMS to AlloyDB for PostgreSQL*, GOOGLE CLOUD, https://cloud.google.com/blog/products/databases/urban-outfitters-moves-sterling-oms-to-alloydb-for-postgresql (accessed Sep. 29, 2026).

37. The URBN E-Commerce Platform and Service receives an electronic user transaction initiated at a user platform including a user interface accessible from a user device (e.g., computer or mobile device) over a network (e.g., the Internet). The electronic user transaction is associated with a unique user identifier (e.g., the consumer's account) and a unique item identifier (e.g., an item of clothing), to be placed in a virtual closet and purchased according to a purchase service.

38. The URBN E-Commerce Platform and Service receives an item operations request from the warehouse operations portal and/or the administrative portal to initiate order processing of an identified item for an identified user, and, in response, initiates one or more microservices to fulfill those requests and initiate shipping of the item to the user at a physical address.

39. The URBN E-Commerce Platform and Service provides functionality for the microservice to be hosted via a virtual private cloud and the item operations request to be fulfilled by an API implemented as the microservice. Additionally, the URBN E-Commerce Platform and Service provides functionality to update a transaction database and an analytics database based on completion of an item operations request. For example, the URBN E-Commerce Platform and Service uses IBM Sterling Order Management System and Google Cloud to accomplish these functions.

> ***Editor's note:*** *Urban Outfitters, Inc. (URBN) recently completed a major infrastructure upgrade, migrating its IBM Sterling Order Management System (Sterling OMS) from an Oracle database to Google Cloud's AlloyDB for PostgreSQL. This strategic move, a testament to the growing partnership between Google Cloud and IBM, delivers significant benefits for URBN, paving the way for increased efficiency, reduced costs, and a future-proofed technology landscape. This success story showcases how businesses can leverage AlloyDB for PostgreSQL to modernize their databases and unlock new levels of performance and scalability.*
>
> In the fast-paced world of retail, order management is the backbone of a seamless customer experience. Urban Outfitters, Inc. (URBN) relies on IBM Sterling Order Management System (Sterling OMS) as the nerve center of its global ecommerce operations, orchestrating everything from order capture and real-time inventory tracking to fulfillment optimization and post-purchase logistics. This system helps ensure that URBN can efficiently process millions of transactions across its global network of stores, warehouses, and digital channels, delivering on customer expectations for fast, accurate, and flexible order fulfillment.

*Urban Outfitters achieves major cost savings by moving Sterling OMS to AlloyDB for PostgreSQL*, GOOGLE CLOUD, https://cloud.google.com/blog/products/databases/urban-outfitters-moves-sterling-oms-to-alloydb-for-postgresql (accessed Sep. 29, 2026) (describing URBN E-Commerce operations).

# Overview

Last Updated: 2026-07-31

IBM Sterling® Order Management System is a software as a service (SaaS) offering, which is designed for organizations that are looking for foundational order management capabilities to augment their existing e-commerce initiative or to start a new omnichannel initiative. With Sterling™ Order Management System, you can manage these complexities, and improve the supply chain efficiencies and business responsiveness of your organization by cost-effectively orchestrating global product and service fulfillment across the extended enterprise.

You can use the Sterling Order Management System offering to deliver a seamless order management experience across all channels, which creates a complete shopping experience for your customers.

With Sterling Order Management System, you can enhance cross-channel efficiencies by improving and streamlining complex order management and fulfillment operations across your commerce systems. The Sterling Order Management System offering includes the following solution-based packages and services:

- IBM Sterling Order Management System Standard Edition (formerly IBM Sterling Order Management System Service):
  Full-featured omnichannel Sterling Order Management System IBM Cloud® Service offering that is designed to enable intelligent matching of internal and external sources of supply and demand while adhering to business rules configurable.
- IBM Sterling Order Management System Essentials Edition (SaaS offering):
  Delivers faster time to value with a foundational set of features and services for order management and inventory availability.

*Overview,* IBM, https://www.ibm.com/docs/en/order-management?topic=overview (last updated July 31, 2026) (accessed Sep. 29, 2026).

**COUNT I**
**(INFRINGEMENT OF U.S. PATENT NO. 11,087,392)**

40. Plaintiff repeats and re-alleges each of the foregoing paragraphs of this Complaint as if fully set forth herein.

41. Plaintiff is the owner of all right, title, and interest in and to U.S. Patent No. 11,087,392, entitled "SYSTEMS AND METHODS FOR ANALYSIS OF WEARABLE ITEMS OF A CLOTHING SUBSCRIPTION PLATFORM." The '392 patent was duly and legally issued by the United States Patent and Trademark Office in full compliance with Title 35 of the United States Code.

42. Defendant Urban Outfitters, Inc. has and continues to directly and/or indirectly infringe (by inducing infringement and/or contributing to infringement) one or more claims of the '392 patent in this District and elsewhere in Texas and the United States, including through the

Nuuly Platform and Service, which Defendant operates (directly and/or through its wholly-owned subsidiary, agent, and alter ego URBN SR LLC).

43. On information and belief, Defendant designs, develops, tests, uses, markets, operates, offers to sell, sells, imports, and/or provides the accused Nuuly Platform and Service, including its components, modules, applications, portals, and database services that infringe the ’392 patent, via, for example, the activities of Defendant and its strategic business units, alter egos, intermediaries, agents, related entities, subsidiaries, affiliates, vendors, suppliers, and/or partners.

44. Defendant directly infringes the ’392 patent via 35 U.S.C. § 271(a) by making, using (including via testing), offering, selling, and/or importing the accused Nuuly Platform and Service, its components, and/or services containing the same that incorporate the fundamental technologies covered by the ’392 patent, for example, to or for Defendant itself, its subsidiaries, affiliates, vendors, suppliers, business partners, customers, subscribers, and/or consumers.

45. For example, Defendant infringes at least claim 1 of the ’392 patent via the Nuuly Platform and Service, which is a monthly subscription clothing rental service that dynamically manages data associated with the digitally enacted rental and purchase of wearable items.

46. The accused Nuuly Platform and Service includes a computer-implemented method for dynamically managing data associated with electronic transactions of wearable items comprising each of the limitations of claim 1 of the ’392 patent:

> (A) *Receiving, via one or more processors, wearable item data describing one or more wearable items made available for physical shipment to users via electronic transactions*. For example, the Nuuly Platform and Service performs this step by receiving, via one or more processors, wearable item data (e.g., catalog data, sizing, and item attributes) describing wearable items (e.g., garments) made available for physical shipment to users via electronic transactions (e.g., rental and purchase transactions).

(B) *Hosting, by the one or more processors, an electronic warehouse operations portal and/or an electronic administrative portal comprising user interfaces accessible from one or more devices over one or more networks*. For example, the Nuuly Platform and Service performs this step by hosting (e.g., on its cloud-based architecture leveraging Google Kubernetes Engine and Confluent Cloud) an electronic warehouse operations portal and/or an electronic administrative portal comprising user interfaces accessible from one or more devices over networks and managing cataloging, order capture and processing, inventory, fulfillment, post-purchase logistics, and distribution-center operations.

(C) *Receiving, by the one or more processors, one or more electronic user transactions initiated at one or more user platforms, each associated with at least one unique user identifier and at least one unique item identifier identifying a wearable item described in the received wearable item data to be placed in a virtual closet and rented according to a subscription, wherein the one or more user platforms comprise one or more user interfaces accessible from one or more user devices over the one or more networks*. For example, the Nuuly Platform and Service performs this step by receiving electronic user transactions initiated at user platforms accessible over a network (e.g., the Internet), each associated with at least one unique user identifier (e.g., the subscriber's account) and at least one unique item identifier identifying a wearable item placed in a virtual closet and rented according to a subscription (e.g., monthly subscription).

(D) *Receiving, by the one or more processors, one or more wearable item operations requests from at least one of the electronic warehouse operations portal and the electronic administrative portal to initiate order processing of the wearable item identified by the unique user identifier and the unique item identifier for a user identified by the unique user identifier*. For example, the Nuuly Platform and Service performs this step by receiving wearable item operations requests from the warehouse operations portal and/or the electronic administrative portal to initiate order processing of the wearable item identified by the unique user identifier and the unique item identifier for the user (e.g., subscriber).

(E) *In response to receiving the one or more wearable item operations requests, initiating one or more microservices to fulfill the one or more wearable item operations requests to initiate shipping of the wearable item to the user at a physical address according to the subscription*. For example, the Nuuly Platform and Service performs this step by, in response to receiving the wearable item operations requests, initiating one or more microservices (e.g., order processing, inventory allocation, garment allocation, fulfillment, and/or return processing) to fulfill the requests and initiate shipping of the wearable item to the subscriber at a physical address (e.g., a residential address or in store pick-up location) according to the subscription.

47. Upon and since the date of filing of Stratopatent's Complaint for Patent Infringement, Defendant has had knowledge of the '392 patent.

48. Plaintiff has complied with all requirements of 35 U.S.C. § 287 relating to its assertion of infringement of the '392 patent by Defendant. Specifically, Plaintiff does not make any products subject to the marking requirement of 35 U.S.C. § 287.

49. Upon and since the date of filing of Stratopatent's Complaint for Patent Infringement, Defendant has actively induced, under 35 U.S.C. § 271(b), others (including at least its related entities, subsidiaries, affiliates, partners, vendors, suppliers, subscribers, customers, and/or end users who make, market, offer, sell, provide, import, and/or use the Nuuly Platform and Service) to directly infringe one or more claims of the '392 patent. Defendant intends to cause, and has taken affirmative and purposeful steps to induce, infringement by others with knowledge (or willful blindness to the fact) that the induced acts constitute patent infringement. For example, as shown in Defendant's marketing, support materials, specifications, and public descriptions of the Nuuly Platform and Service, Defendant enables and actively induces direct infringement by:

(A) **Providing and Operating the Accused Instrumentalities:** Defendant designs, builds, operates, and makes available the Accused Instrumentalities (including

related services, user-facing applications, websites, and mobile applications), thereby enabling and causing others (e.g., its subscribers, customers, and end users) to perform the claimed methods, for example, when they browse, reserve, rent, purchase, receive, and/or return items using the Accused Instrumentalities. *See, e.g., How Nuuly Works*, NUULY, https://www.nuuly.com/rent/how-it-works (last visited Oct. 29, 2026) (marketing Nuuly, describing "How Nuuly Works" and encouraging consumers to download the "Nuuly" app via a link to the Apple App Store); *Urban Outfitters*, URBAN OUTFITTERS, https://www.urbanoutfitters.com/?msockid=18e4c4923fad6ad90274d72f3e9a6bed (last visited Oct. 29, 2026) (offering products, including garments, encouraging customers to purchase product via an Accused Instrumentality and "Sign Up to Earn Rewards + Special Offers," providing various links under the "Help" heading, and encouraging consumers to download the "Urban Outfitters" app via links to the Apple App Store and Google Play).

(B) **Providing Instructions and Support:** Defendant publishes and distributes content, for example, instructional materials, guides, help pages, FAQs, and/or customer support, to instruct others (e.g., subscribers, customers, and end users) how to use the Accused Instrumentalities in the infringing manner, including how to create accounts, place items in a virtual closet or bag, place orders, arrange shipping, and/or process returns. *See e.g., id.*

(C) **Marketing and Promoting Infringing Use:** Defendant markets and promotes the Accused Instrumentalities to consumers throughout the United States and this District, encouraging and inducing the infringing use of the Accused Instrumentalities. *See e.g., id.*

(D) **Integrating with Fulfillment and Logistics Systems:** Defendant integrates the Accused Instrumentalities with its fulfillment centers, distribution operations, and/or

third-party providers to perform steps including order processing, shipping, and returns, and to enable the backend microservices to fulfill user requests. *See e.g., id.*

50. Upon and since the date of filing of Stratopatent's Complaint for Patent Infringement, Defendant has also contributorily infringed, and continues to contributorily infringe, one or more claims of the '392 patent under 35 U.S.C. § 271(c) by providing to others (e.g., its subscribers, customers, and end users) the Nuuly Platform and Service and/or portions thereof, which constitute at least a material part of the patented methods of the '392 patent, are especially made and/or especially adapted for use in an infringement of the '392 patent, and are not staple articles of commerce or commodities suitable for substantial non-infringing use. For example, the Nuuly Platform and Service is designed and marketed exclusively to execute subscription based clothing rental and transaction operations, and its core backend modules have no substantial non-infringing use.

51. Defendant has had actual knowledge of the '392 patent and that the Nuuly Platform and Service is especially made or adapted for use in an infringement of the '392 patent since at least the filing of this Complaint. Despite this knowledge, Defendant continues to operate, market, offer, sell, and provide the Nuuly Platform and Service, by which Defendant and others (e.g., its alter egos, intermediaries, agents, related entities, subsidiaries, affiliates, vendors, suppliers, partners, subscribers, customers, and/or end users) directly infringe the claims of the '392 patent.

52. Upon and since the date of filing of Stratopatent's Complaint for Patent Infringement, despite having knowledge of the '392 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '392 patent, Defendant has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Defendant's activities have been and continue to be willful, wanton, in bad-faith, deliberate, consciously

wrongful, and an egregious case of misconduct beyond typical infringement, such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

53. Plaintiff Stratopatent has been damaged as a result of Defendant's infringing conduct described in this Count. Defendant is liable to Stratopatent in an amount that adequately compensates Stratopatent for Defendant's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT II
## (INFRINGEMENT OF U.S. PATENT NO. 11,348,166)

54. Plaintiff repeats and re-alleges each of the foregoing paragraphs of this Complaint as if fully set forth herein.

55. Plaintiff is the owner of all right, title, and interest in and to U.S. Patent No. 11,348,166, entitled "SYSTEMS AND METHODS FOR ANALYSIS OF WEARABLE ITEMS OF A CLOTHING SUBSCRIPTION PLATFORM." The '166 patent was duly and legally issued by the United States Patent and Trademark Office in full compliance with Title 35 of the United States Code.

56. Defendant Urban Outfitters, Inc. has and continues to directly and/or indirectly infringe (by inducing infringement and/or contributing to infringement) one or more claims of the '166 patent in this District and elsewhere in Texas and the United States, including through the Nuuly Platform and Service, which Defendant operates (directly and/or through its wholly-owned subsidiary, agent, and alter ego URBN SR LLC) and the URBN E-Commerce Platform and Service, which Defendant operates (directly and/or through its wholly-owned subsidiary, agent, and alter ego URBN US RETAIL LLC).

57. On information and belief, Defendant designs, develops, tests, uses, markets, operates, offers to sell, sells, imports, and/or provides the Accused Instrumentalities, including their components, modules, applications, portals, and database services that infringe the ’166 patent, via, for example, the activities of Defendant and its strategic business units, alter egos, intermediaries, agents, related entities, subsidiaries, affiliates, vendors, suppliers, and/or partners.

58. Defendant directly infringes the ’166 patent via 35 U.S.C. § 271(a) by making, using (including via testing), offering, selling, and/or importing the Accused Instrumentalities, their components, and/or services containing the same that incorporate the fundamental technologies covered by the ’166 patent, for example, to or for Defendant itself, its subsidiaries, affiliates, vendors, suppliers, business partners, customers, subscribers, and/or consumers.

59. For example, Defendant infringes at least claim 1 of the ’166 patent via the Accused Instrumentalities, which dynamically manage data associated with the electronic purchase transactions of items across Defendant’s Urban Outfitters, Free People, FP Movement, and Anthropologie brands.

60. The Accused Instrumentalities include a computer-implemented method for dynamically managing data associated with electronic transactions of items comprising each of the limitations of claim 1 of the ’166 patent:

> (A) *Receiving, by one or more processors, item data describing one or more items made available for physical shipment to users via electronic transactions*. For example, the Accused Instrumentalities perform this step by receiving, via one or more processors, item data (e.g., catalog data and item attributes) describing items made available for physical shipment to customers via electronic transactions across Defendant’s Urban Outfitters, Free People, FP Movement, and/or Anthropologie brands.

(B) *Hosting, by the one or more processors, an electronic warehouse operations portal and/or an electronic administrative portal comprising user interfaces accessible from one or more devices over one or more networks*. For example, the Accused Instrumentalities perform this step by hosting (e.g., on IBM's Sterling Order Management System operating on Google Cloud's AlloyDB for PostgreSQL and/or on its cloud-based architecture leveraging Google Kubernetes Engine and Confluent Cloud) an electronic warehouse operations portal and/or an electronic administrative portal comprising user interfaces accessible from devices over networks and managing cataloging, order capture and processing, inventory, fulfillment, post-purchase logistics, and distribution-center operations.

(C) *Receiving, by the one or more processors, one or more electronic user transactions initiated at one or more user platforms, each of the one or more electronic user transactions associated with at least one unique user identifier and at least one unique item identifier identifying an item described in the received item data to be placed in a virtual closet and rented or purchased according to a subscription, purchase, or rental service, wherein the one or more user platforms comprise one or more user interfaces accessible from one or more user devices over the one or more networks*. For example, the Accused Instrumentalities perform this step by receiving electronic user transactions initiated at user platforms accessible over a network (e.g., the Internet), each associated with at least one unique user identifier (e.g., the customer's account) and at least one unique item identifier identifying an item placed in a virtual closet (e.g., shopping bag showing product to be purchased) and purchased according to a purchase service.

(D) *Receiving, by the one or more processors, one or more item operations requests from at least one of the electronic warehouse operations portal and the electronic administrative portal to initiate order processing of the item identified by the at least one unique user identifier and the at least one unique item identifier for a user identified by the at least one unique user identifier*. For example, the Accused Instrumentalities perform this step by receiving item operations requests from the warehouse operations portal and/or the electronic administrative portal to

initiate order processing of the item identified by the unique user identifier and the unique item identifier for the user (e.g., customer).

(E) *In response to receiving the one or more item operations requests, initiating one or more microservices to fulfill the one or more item operations requests to initiate shipping of the item to the user at a physical address according to the subscription, purchase, or rental service*. For example, the Accused Instrumentalities perform this step by, in response to the item operations requests, initiating one or more microservices (e.g., order processing, inventory allocation, garment allocation, fulfillment, and/or return processing) to fulfill the requests and initiate shipping of the item to the customer at a physical address according to the purchase service.

61. Upon and since the date of filing of Stratopatent's Complaint for Patent Infringement, Defendant has had knowledge of the '166 patent.

62. Plaintiff has complied with all requirements of 35 U.S.C. § 287 relating to its assertion of infringement of the '166 patent by Defendant. Specifically, Plaintiff does not make any products subject to the marking requirement of 35 U.S.C. § 287.

63. Upon and since the date of filing of Stratopatent's Complaint for Patent Infringement, Defendant has actively induced, under 35 U.S.C. § 271(b), others (including at least its alter egos, intermediaries, agents, related entities, subsidiaries, affiliates, vendors, suppliers, partners, subscribers, customers, and/or end users who make, market, offer, sell, provide, import, and/or use the Accused Instrumentalities) to directly infringe one or more claims of the '166 patent. Defendant intends to cause, and has taken affirmative and purposeful steps to induce, infringement by others with knowledge (or willful blindness to the fact) that the induced acts constitute patent infringement. For example, as shown in Defendant's marketing, support materials, specifications, and public descriptions of the Accused Instrumentalities, Defendant enables and actively induces direct infringement by:

(A) **Providing and Operating the Accused Instrumentalities:** Defendant designs, builds, operates, and makes available the Accused Instrumentalities (including related services, user-facing applications, websites, and mobile applications), thereby enabling and causing others (e.g., its subscribers, customers, and end users) to perform the claimed methods, for example, when they browse, reserve, rent, purchase, receive, and/or return items using the Accused Instrumentalities. *See, e.g., How Nuuly Works*, NUULY, https://www.nuuly.com/rent/how-it-works (last visited Oct. 29, 2026) (marketing Nuuly, describing "How Nuuly Works" and encouraging consumers to download the "Nuuly" app via a link to the Apple App Store); *Urban Outfitters*, URBAN OUTFITTERS, https://www.urbanoutfitters.com/?msockid=18e4c4923fad6ad90274d72f3e9a6bed (last visited Oct. 29, 2026) (offering products, including garments, encouraging customers to purchase product via an Accused Instrumentality and "Sign Up to Earn Rewards + Special Offers," providing various links under the "Help" heading, and encouraging consumers to download the "Urban Outfitters" app via links to the Apple App Store and Google Play).

(B) **Providing Instructions and Support:** Defendant publishes and distributes content, for example, instructional materials, guides, help pages, FAQs, and/or customer support, to instruct others (e.g., subscribers, customers, and end users) how to use the Accused Instrumentalities in the infringing manner, including how to create accounts, place items in a virtual closet or bag, place orders, arrange shipping, and/or process returns. *See e.g., id.*

(C) **Marketing and Promoting Infringing Use:** Defendant markets and promotes the Accused Instrumentalities to consumers throughout the United States and this District, encouraging and inducing the infringing use of the Accused Instrumentalities. *See e.g., id.*

(D) **Integrating with Fulfillment and Logistics Systems:** Defendant integrates the Accused Instrumentalities with its fulfillment centers, distribution operations, and/or third-party providers to perform steps including order processing, shipping, and returns, and to enable the backend microservices to fulfill user requests. *See e.g., id.*

64. Upon and since the date of filing of Stratopatent's Complaint for Patent Infringement, Defendant has also contributorily infringed, and continues to contributorily infringe, one or more claims of the '166 patent under 35 U.S.C. § 271(c) by providing to others (e.g., its subscribers, customers, and end users) the Accused Instrumentalities and/or portions thereof, which constitute at least a material part of the patented methods of the '166 patent, are especially made and/or especially adapted for use in an infringement of the '166 patent, and are not staple articles of commerce or commodities suitable for substantial non-infringing use. For example, the Nuuly Platform and Service is designed and marketed exclusively to execute subscription based clothing rental and transaction operations, and its core backend modules have no substantial non-infringing use. As another example, the URBN E-Commerce Platform and Service is designed and marketed exclusively to execute operations for electronic transactions of items (e.g., wearable items), including managing data and/or communications associated with transactions, and its core backend modules have no substantial non-infringing use.

65. Defendant has had actual knowledge of the '166 patent and that the Accused Instrumentalities are especially made or adapted for use in an infringement of the '166 patent since at least the filing of this Complaint. Despite this knowledge, Defendant continues to operate, market, offer, sell, and provide the Accused Instrumentalities, by which Defendant and others (e.g., its alter egos, intermediaries, agents, related entities, subsidiaries, affiliates, vendors, suppliers, partners, subscribers, customers, and/or end users) directly infringe the claims of the '166 patent.

66. Upon and since the date of filing of Stratopatent's Complaint for Patent Infringement, despite having knowledge of the '166 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '166 patent, Defendant has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Defendant's activities have been and continue to be willful, wanton, in bad-faith, deliberate, consciously wrongful, and an egregious case of misconduct beyond typical infringement, such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

67. Plaintiff Stratopatent has been damaged as a result of Defendant's infringing conduct described in this Count. Defendant is liable to Stratopatent in an amount that adequately compensates Stratopatent for Defendant's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

**COUNT III**
**(INFRINGEMENT OF U.S. PATENT NO. 10,902,510)**

68. Plaintiff repeats and re-alleges each of the foregoing paragraphs of this Complaint as if fully set forth herein.

69. Plaintiff is the owner of all right, title, and interest in and to U.S. Patent No. 10,902,510, entitled "SYSTEMS AND METHODS FOR ANALYSIS OF WEARABLE ITEMS OF A CLOTHING SUBSCRIPTION PLATFORM." The '510 patent was duly and legally issued by the United States Patent and Trademark Office in full compliance with Title 35 of the United States Code.

70. Defendant Urban Outfitters, Inc. has and continues to directly and/or indirectly infringe (by inducing infringement and/or contributing to infringement) one or more claims of the

’510 patent in this District and elsewhere in Texas and the United States, including through the Nuuly Platform and Service, which Defendant operates (directly and/or through its wholly-owned subsidiary, agent, and alter ego URBN SR LLC).

71. On information and belief, Defendant designs, develops, tests, uses, markets, operates, offers to sell, sells, imports, and/or provides the accused Nuuly Platform and Service, including its components, modules, applications, portals, and database services that infringe the ’510 patent, via, for example, the activities of Defendant and its strategic business units, alter egos, intermediaries, agents, related entities, subsidiaries, affiliates, vendors, suppliers, and/or partners.

72. Defendant directly infringes the ’510 patent via 35 U.S.C. § 271(a) by making, using (including via testing), offering, selling, and/or importing the accused Nuuly Platform and Service, its components, and/or services containing the same that incorporate the fundamental technologies covered by the ’510 patent, for example, to or for Defendant itself, its subsidiaries, affiliates, vendors, suppliers, business partners, customers, subscribers, and/or consumers.

73. For example, Defendant infringes at least claim 1 of the ’510 patent via the Nuuly Platform and Service, which dynamically manages data associated with the digitally enacted rental and purchase of wearable items.

74. The accused Nuuly Platform and Service includes a computer-implemented method for dynamically managing data associated with electronic transactions of wearable items comprising each of the limitations of claim 1 of the ’510 patent:

> (A) *Receiving, by one or more processors, wearable item data from one or more electronic tenant interfaces, the wearable item data describing one or more wearable items made available for physical shipment to users via electronic transactions, wherein the one or more electronic tenant interfaces comprise one or more user interfaces accessible from one or more tenant devices over one or more networks*. For example, the Nuuly Platform and Service performs this step by

receiving, via one or more processors, wearable item data (e.g., catalog data, sizing, and item attributes) from electronic tenant interfaces used by brands and merchandising personnel to manage inventory and item attributes, making wearable items (e.g., garments) available for physical shipment to subscribers via electronic transactions (e.g., rental and purchase transactions), the tenant interfaces being accessible from tenant devices over networks.

(B) *Hosting, by the one or more processors, an electronic warehouse operations portal and/or an electronic administrative portal, the electronic warehouse operations portal and/or electronic administrative portal comprising user interfaces accessible from one or more employee devices over the one or more networks*. For example, the Nuuly Platform and Service performs this step by hosting (e.g., on its cloud-based architecture leveraging Google Kubernetes Engine and Confluent Cloud) an electronic warehouse operations portal and/or an electronic administrative portal whose user interfaces are accessible from one or more employee devices over networks and managing cataloging, order capture and processing, inventory, fulfillment, post-purchase logistics, and distribution-center operations.

(C) *Receiving, by the one or more processors, one or more electronic user transactions initiated at one or more user platforms, each of the one or more electronic user transactions associated with at least one unique user identifier and at least one unique item identifier identifying a wearable item described in the received wearable item data to be placed in a virtual closet and rented according to a subscription, wherein the one or more user platforms comprise one or more user interfaces accessible from one or more user devices over the one or more networks*. For example, the Nuuly Platform and Service performs this step by receiving electronic user transactions initiated at user platforms accessible over a network (e.g., the Internet), each associated with at least one unique user identifier (e.g., the subscriber's account) and at least one unique item identifier identifying a wearable item placed in a virtual closet and rented according to a subscription (e.g., monthly subscription).

(D) *Receiving, by the one or more processors, one or more wearable item operations requests from at least one of the electronic warehouse operations portal, the electronic administrative portal, and the one or more electronic tenant interfaces to initiate order processing of the wearable item identified by the unique user identifier and the unique item identifier for a user identified by the received unique user identifier*. For example, the Nuuly Platform and Service performs this step by receiving wearable item operations requests from the warehouse operations portal, the electronic administrative portal, and/or the one or more electronic tenant interfaces to initiate order processing of the wearable item identified by the unique user identifier and the unique item identifier for the user (e.g., subscriber).

(E) *In response to receiving the one or more wearable item operations requests, initiating one or more microservices to fulfill the one or more wearable item operations requests*. For example, the Nuuly Platform and Service performs this step by, in response to receiving the one or more wearable item operations requests, initiating one or more microservices (e.g., order processing, inventory allocation, garment allocation, fulfillment, and/or return processing) to fulfill the wearable item operations requests.

(F) *In response to receiving the one or more electronic user transactions and the one or more wearable item operations requests, updating, by the one or more processors, one or more transaction databases and one or more analytics databases, based on the one or more electronic user transactions to initiate shipping of the wearable item to the user at a physical address*. For example, the Nuuly Platform and Service performs this step by, in response to receiving the one or more electronic user transactions and the wearable item operations requests, updating one or more transaction databases and one or more analytics databases based on the one or more user transactions to initiate shipping of the wearable item to the user (e.g., subscriber) at a physical address.

75. Upon and since the date of filing of Stratopatent's Complaint for Patent Infringement, Defendant has had knowledge of the '510 patent.

76. Plaintiff has complied with all requirements of 35 U.S.C. § 287 relating to its assertion of infringement of the ’510 patent by Defendant. Specifically, Plaintiff does not make any products subject to the marking requirement of 35 U.S.C. § 287.

77. Upon and since the date of filing of Stratopatent’s Complaint for Patent Infringement, Defendant has actively induced, under 35 U.S.C. § 271(b), others (including at least its alter egos, intermediaries, agents, related entities, subsidiaries, affiliates, vendors, suppliers, partners, subscribers, customers, and/or end users who make, market, offer, sell, provide, import, and/or use the Nuuly Platform and Service) to directly infringe one or more claims of the ’510 patent. Defendant intends to cause, and has taken affirmative and purposeful steps to induce, infringement by others with knowledge (or willful blindness to the fact) that the induced acts constitute patent infringement. For example, as shown in Defendant’s marketing, support materials, specifications, and public descriptions of the Nuuly Platform and Service, Defendant enables and actively induces direct infringement by:

(A) **Providing and Operating the Accused Instrumentalities:** Defendant designs, builds, operates, and makes available the Accused Instrumentalities (including related services, user-facing applications, websites, and mobile applications), thereby enabling and causing others (e.g., its subscribers, customers, and end users) to perform the claimed methods, for example, when they browse, reserve, rent, purchase, receive, and/or return items using the Accused Instrumentalities. *See, e.g., How Nuuly Works*, NUULY, https://www.nuuly.com/rent/how-it-works (last visited Oct. 29, 2026) (marketing Nuuly, describing “How Nuuly Works” and encouraging consumers to download the “Nuuly” app via a link to the Apple App Store); *Urban Outfitters*, URBAN OUTFITTERS, https://www.urbanoutfitters.com/?msockid=18e4c4923fad6ad90274d72f3e9a6bed (last

visited Oct. 29, 2026) (offering products, including garments, encouraging customers to purchase product via an Accused Instrumentality and "Sign Up to Earn Rewards + Special Offers," providing various links under the "Help" heading, and encouraging consumers to download the "Urban Outfitters" app via links to the Apple App Store and Google Play).

(B) **Providing Instructions and Support:** Defendant publishes and distributes content, for example, instructional materials, guides, help pages, FAQs, and/or customer support, to instruct others (e.g., subscribers, customers, and end users) how to use the Accused Instrumentalities in the infringing manner, including how to create accounts, place items in a virtual closet or bag, place orders, arrange shipping, and/or process returns. *See e.g., id.*

(C) **Marketing and Promoting Infringing Use:** Defendant markets and promotes the Accused Instrumentalities to consumers throughout the United States and this District, encouraging and inducing the infringing use of the Accused Instrumentalities. *See e.g., id.*

(D) **Integrating with Fulfillment and Logistics Systems:** Defendant integrates the Accused Instrumentalities with its fulfillment centers, distribution operations, and/or third-party providers to perform steps including order processing, shipping, and returns, and to enable the backend microservices to fulfill user requests. *See e.g., id.*

78. Upon and since the date of filing of Stratopatent's Complaint for Patent Infringement, Defendant has also contributorily infringed, and continues to contributorily infringe, one or more claims of the '510 patent under 35 U.S.C. § 271(c) by providing to others (e.g., its subscribers, customers, and end users) the Nuuly Platform and Service and/or portions thereof, which constitute at least a material part of the patented methods of the '510 patent, are especially made and/or especially adapted for use in an infringement of the '510 patent, and are not staple

articles of commerce or commodities suitable for substantial non-infringing use. For example, the Nuuly Platform and Service is designed and marketed exclusively to execute subscription based clothing rental and transaction operations, and its core backend modules have no substantial non-infringing use.

79. Defendant has had actual knowledge of the ’510 patent and that the Nuuly Platform and Service is especially made or adapted for use in an infringement of the ’510 patent since at least the filing of this Complaint. Despite this knowledge, Defendant continues to operate, market, offer, sell, and provide the Nuuly Platform and Service, by which Defendant and others (e.g., its alter egos, intermediaries, agents, related entities, subsidiaries, affiliates, vendors, suppliers, partners, subscribers, customers, and/or end users) directly infringe the claims of the ’510 patent.

80. Upon and since the date of filing of Stratopatent’s Complaint for Patent Infringement, despite having knowledge of the ’510 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the ’510 patent, Defendant has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Defendant’s activities have been and continue to be willful, wanton, in bad-faith, deliberate, consciously wrongful, and an egregious case of misconduct beyond typical infringement, such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

81. Plaintiff Stratopatent has been damaged as a result of Defendant’s infringing conduct described in this Count. Defendant is liable to Stratopatent in an amount that adequately compensates Stratopatent for Defendant’s infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

**COUNT IV**
**(INFRINGEMENT OF U.S. PATENT NO. 12,033,208)**

82. Plaintiff repeats and re-alleges each of the foregoing paragraphs of this Complaint as if fully set forth herein.

83. Plaintiff is the owner of all right, title, and interest in and to U.S. Patent No. 12,033,208, entitled "SYSTEMS AND METHODS FOR ANALYSIS OF WEARABLE ITEMS OF A CLOTHING SUBSCRIPTION PLATFORM." The '208 patent was duly and legally issued by the United States Patent and Trademark Office in full compliance with Title 35 of the United States Code.

84. Defendant Urban Outfitters, Inc. has and continues to directly and/or indirectly infringe (by inducing infringement and/or contributing to infringement) one or more claims of the '208 patent in this District and elsewhere in Texas and the United States, including through the Nuuly Platform and Service, which Defendant operates (directly and/or through its wholly-owned subsidiary, agent, and alter ego URBN SR LLC) and the URBN E-Commerce Platform and Service, which Defendant operates (directly and/or through its wholly-owned subsidiary, agent, and alter ego URBN US RETAIL LLC).

85. On information and belief, Defendant designs, develops, tests, uses, markets, operates, offers to sell, sells, imports, and/or provides the Accused Instrumentalities, including their components, modules, applications, portals, and database services that infringe the '208 patent, via, for example, the activities of Defendant and its strategic business units, alter egos, intermediaries, agents, related entities, subsidiaries, affiliates, vendors, suppliers, and/or partners.

86. Defendant directly infringes the '208 patent via 35 U.S.C. § 271(a) by making, using (including via testing), offering, selling, and/or importing the Accused Instrumentalities, their components, and/or services containing the same that incorporate the fundamental

technologies covered by the ’208 patent, for example, to or for Defendant itself, its subsidiaries, affiliates, vendors, suppliers, business partners, customers, subscribers, and/or consumers.

87. For example, Defendant infringes at least claim 1 of the ’208 patent via the Accused Instrumentalities, which dynamically manage data associated with the electronic purchase transactions of items across Defendant’s Urban Outfitters, Free People, FP Movement, and Anthropologie brands.

88. The Accused Instrumentalities include a computer-implemented method for dynamically managing data associated with electronic transactions of items comprising each of the limitations of claim 1 of the ’208 patent:

> (A) *Receiving, by one or more processors, item data describing one or more items made available for physical shipment to users via one or more electronic transaction application programming interfaces (APIs)*. For example, the Accused Instrumentalities perform this step by receiving, via one or more processors, item data (e.g., catalog data and item attributes) describing items made available for physical shipment to customers via one or more electronic transaction application programming interfaces (APIs), including the integration and order-management APIs of its IBM Sterling Order Management System operating on Google Cloud.
>
> (B) *Hosting, by the one or more processors, an electronic warehouse operations portal and/or an electronic administrative portal comprising user interfaces accessible from one or more devices over one or more networks*. For example, the Accused Instrumentalities perform this step by hosting (e.g., on IBM’s Sterling Order Management System operating on Google Cloud’s AlloyDB for PostgreSQL and/or on its cloud-based architecture leveraging Google Kubernetes Engine and Confluent Cloud) an electronic warehouse operations portal and/or an electronic administrative portal comprising user interfaces accessible from devices over networks and managing cataloging, order capture and processing, inventory, fulfillment, post-purchase logistics, and distribution-center operations.

(C) *Receiving, by the one or more processors, one or more electronic user transactions initiated at one or more user platforms, each of the one or more electronic user transactions associated with at least one unique user identifier and at least one unique item identifier identifying an item described in the received item data to be placed in a virtual closet and rented or purchased according to a subscription, purchase, or rental service, wherein the one or more user platforms comprise one or more user interfaces accessible from one or more user devices over the one or more networks*. For example, the Accused Instrumentalities perform this step by receiving electronic user transactions initiated at user platforms accessible over a network (e.g., the Internet), each associated with at least one unique user identifier (e.g., the customer's account) and at least one unique item identifier identifying an item placed in a virtual closet (e.g., shopping bag showing product to be purchased) and purchased according to a purchase service.

(D) *Receiving, by the one or more processors, one or more item operations requests from at least one of the electronic warehouse operations portal and the electronic administrative portal to initiate order processing of the item identified by the at least one unique user identifier and the at least one unique item identifier for a user identified by the at least one unique user identifier*. For example, the Accused Instrumentalities perform this step by receiving item operations requests from the warehouse operations portal and/or the electronic administrative portal to initiate order processing of the item identified by the unique user identifier and the unique item identifier for the user (e.g., customer).

(E) *In response to the one or more item operations requests, initiating, by the one or more processors, one or more application programming interfaces (APIs) to fulfill the one or more item operations requests to initiate shipping of the item to a user at a physical address according to the subscription, purchase, or rental service, the one or more APIs being implemented as a microservice hosted via a virtual private cloud*. For example, the Accused Instrumentalities perform this step by, in response to the item operations requests, initiating one or more APIs to fulfill the requests and initiate shipping of the item to the customer at a physical address according to the subscription, purchase, or rental service, the APIs being

implemented as microservices (e.g., order processing, inventory allocation, garment allocation, fulfillment, and/or return processing) hosted via a cloud environment.

(F) *Updating one or more transaction databases and one or more analytics databases based on completion of the one or more item operations requests*. For example, the Accused Instrumentalities perform this step by updating one or more transaction databases and one or more analytics databases based on completion of the item operations requests.

89. Upon and since the date of filing of Stratopatent's Complaint for Patent Infringement, Defendant has had knowledge of the '208 patent.

90. Plaintiff has complied with all requirements of 35 U.S.C. § 287 relating to its assertion of infringement of the '208 patent by Defendant. Specifically, Plaintiff does not make any products subject to the marking requirement of 35 U.S.C. § 287.

91. Upon and since the date of filing of Stratopatent's Complaint for Patent Infringement, Defendant has actively induced, under 35 U.S.C. § 271(b), others (including at least its alter egos, intermediaries, agents, related entities, subsidiaries, affiliates, vendors, suppliers, partners, subscribers, customers, and/or end users who make, market, offer, sell, provide, import, and/or use the Accused Instrumentalities) to directly infringe one or more claims of the '208 patent. Defendant intends to cause, and has taken affirmative and purposeful steps to induce, infringement by others with knowledge (or willful blindness to the fact) that the induced acts constitute patent infringement. For example, as shown in Defendant's marketing, support materials, specifications, and public descriptions of the Accused Instrumentalities, Defendant enables and actively induces direct infringement by:

(A) **Providing and Operating the Accused Instrumentalities:** Defendant designs, builds, operates, and makes available the Accused Instrumentalities (including

related services, user-facing applications, websites, and mobile applications), thereby enabling and causing others (e.g., its subscribers, customers, and end users) to perform the claimed methods, for example, when they browse, reserve, rent, purchase, receive, and/or return items using the Accused Instrumentalities. *See, e.g., How Nuuly Works*, NUULY, https://www.nuuly.com/rent/how-it-works (last visited Oct. 29, 2026) (marketing Nuuly, describing "How Nuuly Works" and encouraging consumers to download the "Nuuly" app via a link to the Apple App Store); *Urban Outfitters*, URBAN OUTFITTERS, https://www.urbanoutfitters.com/?msockid=18e4c4923fad6ad90274d72f3e9a6bed (last visited Oct. 29, 2026) (offering products, including garments, encouraging customers to purchase product via an Accused Instrumentality and "Sign Up to Earn Rewards + Special Offers," providing various links under the "Help" heading, and encouraging consumers to download the "Urban Outfitters" app via links to the Apple App Store and Google Play).

(B) **Providing Instructions and Support:** Defendant publishes and distributes content, for example, instructional materials, guides, help pages, FAQs, and/or customer support, to instruct others (e.g., subscribers, customers, and end users) how to use the Accused Instrumentalities in the infringing manner, including how to create accounts, place items in a virtual closet or bag, place orders, arrange shipping, and/or process returns. *See e.g., id.*

(C) **Marketing and Promoting Infringing Use:** Defendant markets and promotes the Accused Instrumentalities to consumers throughout the United States and this District, encouraging and inducing the infringing use of the Accused Instrumentalities. *See e.g., id.*

(D) **Integrating with Fulfillment and Logistics Systems:** Defendant integrates the Accused Instrumentalities with its fulfillment centers, distribution operations, and/or

third-party providers to perform steps including order processing, shipping, and returns, and to enable the backend microservices to fulfill user requests. *See e.g., id.*

92. Upon and since the date of filing of Stratopatent's Complaint for Patent Infringement, Defendant has also contributorily infringed, and continues to contributorily infringe, one or more claims of the '208 patent under 35 U.S.C. § 271(c) by providing to others (e.g., its subscribers, customers, and end users) the Accused Instrumentalities and/or portions thereof, which constitute at least a material part of the patented methods of the '208 patent, are especially made and/or especially adapted for use in an infringement of the '208 patent, and are not staple articles of commerce or commodities suitable for substantial non-infringing use. For example, the Nuuly Platform and Service is designed and marketed exclusively to execute subscription based clothing rental and transaction operations, and its core backend modules have no substantial non-infringing use. As another example, the URBN E-Commerce Platform and Service is designed and marketed exclusively to execute operations for electronic transactions of items (e.g., wearable items), including managing data and/or communications associated with transactions, and its core backend modules have no substantial non-infringing use.

93. Defendant has had actual knowledge of the '208 patent and that the Accused Instrumentalities are especially made or adapted for use in an infringement of the '208 patent since at least the filing of this Complaint. Despite this knowledge, Defendant continues to operate, market, offer, sell, and provide the Accused Instrumentalities, by which Defendant and others (e.g., its related entities, subsidiaries, affiliates, partners, vendors, suppliers, subscribers, customers, and/or end users) directly infringe the claims of the '208 patent.

94. Upon and since the date of filing of Stratopatent's Complaint for Patent Infringement, despite having knowledge of the '208 patent and knowledge that it is directly and/or

indirectly infringing one or more claims of the '208 patent, Defendant has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Defendant's activities have been and continue to be willful, wanton, in bad-faith, deliberate, consciously wrongful, and an egregious case of misconduct beyond typical infringement, such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

95. Plaintiff Stratopatent has been damaged as a result of Defendant's infringing conduct described in this Count. Defendant is liable to Stratopatent in an amount that adequately compensates Stratopatent for Defendant's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## JURY DEMAND

96. Plaintiff hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

WHEREFORE, Stratopatent prays for relief against Defendant as follows:

a. entry of judgment declaring that Defendant has directly and/or indirectly infringed one or more claims of each of the Asserted Patents;

b. a full accounting for and an award of damages to Stratopatent for Defendant's infringement of the Asserted Patents, but in no event less than a reasonable royalty, including enhanced damages pursuant to 35 U.S.C. § 284, together with pre- and post-judgment interest;

c. entry of judgment declaring that this case is exceptional and awarding Stratopatent its costs and reasonable attorney fees under 35 U.S.C. § 285; and

d. such other and further relief as the Court deems just and proper.

Dated: November 10, 2026

Respectfully submitted,

*/s/ Terry A. Saad*_______
Terry A. Saad (lead attorney)
Texas Bar No. 24066015
E-mail: tsaad@bosfirm.com
Jeffrey R. Bragalone
Texas Bar No. 02855775
E-mail: jbragalone@bosfirm.com
Marcus Benavides
Texas Bar No. 24035574
E-mail: mbenavides@bosfirm.com
Brandon V. Zuniga
Texas Bar no. 24088720
E-mail: bzuniga@bosfirm.com

**BRAGALONE OLEJKO SAAD PC**
901 Main Street
Suite 3800
Dallas, Texas 75202
Telephone: (214) 785-6670
Facsimile: (214) 785-6680

**ATTORNEYS FOR PLAINTIFF STRATOPATENT LLC**